*15-2028-cr*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2015

No. 15-2028-cr

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

NICOLAS EPSKAMP, ALSO KNOWN AS SEALED DEFENDANT 2,

*Defendant-Appellant.*[*]

Appeal from the United States District Court

for the Southern District of New York.

No. 1:12-cr-00120 — Richard J. Sullivan, *Judge.*

ARGUED: MAY 11, 2016

DECIDED: AUGUST 5, 2016

Before: CABRANES, STRAUB, and LOHIER, *Circuit Judges.*

---

[*] The Clerk of Court is directed to amend the caption to read as shown above.

Appeal from the final judgment of conviction entered upon Defendant-Appellant Nicolas Epskamp by the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) for conspiring to possess with intent to distribute a controlled substance on board an aircraft registered in the United States and possessing with intent to distribute a controlled substance on board an aircraft registered in the United States.  Epskamp challenges the extraterritorial application of federal narcotics law to his conduct, both with respect to the statutory application of 21 U.S.C. § 959(b) and the exercise of such extraterritorial jurisdictional under principles of due process.  Because we find that Epskamp's conduct was proscribed by § 959(b) and that the exercise of jurisdiction in this case did not violate due process, we **AFFIRM** the final judgment of the District Court.

———————

AVROM ROBIN, (Ira D. London, *on the brief*), Law Offices of London & Robin, New York, NY, *for* Nicholas Epskamp.

SHANE T. STANSBURY (Ian McGinley, Anna M. Skotko, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

———————

STRAUB, *Circuit Judge*:

Defendant-Appellant Nicolas Epskamp appeals from a

judgment entered June 24, 2015 in the Southern District of New York

(Richard J. Sullivan, *Judge*).  The judgment followed a seven day jury trial in which Epskamp was found guilty of both counts in a two-count superseding indictment charging him with (1) conspiracy to possess with intent to distribute a controlled substance on board an aircraft registered in the United States, in violation of  21 U.S.C. §§ 812, 959(b)(2), and 960(a)(3); and (2) possessing with intent to distribute a controlled substance on board an aircraft registered in the United States, in violation of 21 U.S.C. §§ 812, 959(b)(2), and 18 U.S.C. § 2.[1]  The controlled substance alleged to be involved in each count was 5 kilograms and more of mixture and substances containing a detectable amount of cocaine, a violation of 21 U.S.C. § 960(b)(1)(B).  The District Court principally sentenced Epskamp to 264 months of incarceration.

---

[1] Prior to trial, Epskamp moved for dismissal of the indictment for lack of jurisdiction.  The arguments raised in that motion—which was denied by the District Court on June 7, 2013—constitute the principalissues discussed in this appeal.

Epskamp raises five issues on appeal: First, he argues that the District Court lacked the power to exercise jurisdiction over his extraterritorial conduct, as a matter of both statutory and constitutional law. Second, he contends that the government adduced insufficient evidence at trial to support a conviction. Third, he claims that the District Court erred in its jury charge by instructing the jury that it could find Epskamp guilty without determining whether he knew of the aircraft's registration in the United States. Fourth, with respect to sentencing, he argues that the District Court clearly erred in denying him a minor role reduction pursuant to U.S.S.G. § 3B1.2(b). Fifth, he contends that he was deprived of his Fifth and Sixth Amendment rights due to the government's alleged failure to assist in arranging for the testimony of an exculpatory witness incarcerated in the Federal Republic of Germany.

We address two issues implicated by Epskamp's various challenges: (1) the proper construction of 21 U.S.C. § 959, particularly with respect to its extraterritorial application and whether it requires a defendant's knowledge of the relevant jurisdictional nexus (i.e., knowing that the aircraft involved is owned by a United States citizen or registered in the United States); and (2) whether application of § 959 to Epskamp's conduct violates constitutional due process. We hold that Epskamp's conduct falls squarely within the ambit of § 959 and that the District Court's exercise of jurisdiction was consistent with due process. The remainder of Epskamp's arguments do not warrant significant explication and are resolved by separate Summary Order, to be issued simultaneously with this Opinion. Accordingly, we AFFIRM the judgment below.

**BACKGROUND**

The evidence produced at trial revealed that the investigation leading to Epskamp's arrest commenced in October 2011 when the United States Drug Enforcement Administration ("DEA") was informed by an American airplane charter company that a Lebanese individual was seeking to charter a flight from the Dominican Republic to Antwerp, Belgium in November 2011. The company told the DEA that two foreign nationals would be transporting a substantial quantity of narcotics on the flight in approximately 20 to 30 suitcases.

After receiving this information, the DEA—in conjunction with a specialized narcotics division of the Dominican National Police[2]—commenced surveillance of La Romana Airport, located approximately 65 miles east of the Dominican capital, Santo Domingo. The Dominican police involved in the operation recruited

[2] This unit was known formally as the División Táactica de Investigaciones Sensitives, or "DITIS." *See* Joint App'x at 267. Its members were specially vetted to engage in sensitive police operations.

two undercover pilots, Carlos Medina ("UC-1") and Danny Jesus ("UC-2") and arranged for them to be introduced to Rawson "Roy" Watson, a British citizen who was involved in the scheme.[3]

In early November 2011, UC-1 met with Rawson at the so-called "VIP" terminal in La Romana Airport. Rawson informed UC-1 that the flight was being rescheduled and provided UC-1 his telephone number. Legal authorization was then obtained to begin intercepting communications over Watson's phone. Watson ultimately informed UC-1 that he would be transporting approximately 600 kilograms of cocaine and that UC-1 would be paid $400,000 for his efforts.[4]

Intercepted communications over the following weeks reveal the various logistical challenges facing those who seek to smuggle

---

[3] Watson, a co-defendant of Epskamp's below, entered a guilty plea and was sentenced principally to 204 months of imprisonment. *See United States v. Epskamp*, No. 1:12-cr-00120-RJS-1, ECF Docket No. 147. Although he entered a notice of appeal on April 22, 2014, *see id.* at ECF Docket No. 148, he is not a participant in this appeal.

[4] UC-1 was also paid $30,000 as an advanced payment for the flight.

large quantities of narcotics over international borders. The flight was repeatedly delayed and rescheduled throughout November. The chartered aircraft was searched by a Dominican police unit unaffiliated with the investigation. Although the search did not yield any evidence—the plane had not yet been laden with cocaine—the search convinced the participants that they would need to obtain a new aircraft, specifically an aircraft registered in the United States, which would draw less suspicion from Dominican authorities.[5]

After these setbacks, Watson left the Dominican Republic for several weeks, telling UC-1 that he was visiting Lebanon and the

---

[5] Watson specifically informed UC-1 that they would need an "N tail number" aircraft, rather than an "H tail number" aircraft. *See* Joint App'x at 245. An aircraft registration number beginning with an "N" indicates registration in the United States, whereas a registration number beginning with "H" reflects registration in the Dominican Republic. *See, e.g.*, 14 C.F.R. § 45.23(a) ("Each operator of an aircraft must display on that aircraft marks consisting of the Roman capital letter 'N' (denoting United States registration) followed by the registration number of the aircraft."); *accord* International Standards: Aircraft Nationality and Registration Marks, International Civil Aviation Organization, Convention on International Civil Aviation, Annex 7, §3.1 (5th ed. 2003).

Netherlands.  The two remained in contact via email, with Watson proposing solutions to the challenges they had been facing at La Romana Airport, including developing a dummy flight plan indicating the charter aircraft was bound for Africa, rather than Belgium, and also bribing a Dominican military officer.  *See United States v. Epskamp*, No. 1:12-cr-00120-RJS-2, ECF Docket No. 190 at 414-22.

In early December 2011, Watson returned to the Dominican Republic with Pako Podunajec, a Dutch citizen who testified as a cooperating witness for the government at trial.  Podunajec—who spoke Dutch, English, German, Spanish, and Croatian—was to serve as translator between Watson and two Colombian nationals who would ultimately supply the conspirators with 1,000 kilograms of cocaine.

Around the same time, on December 4, 2011, Defendant-Appellant Epskamp, who is also a Dutch citizen, likewise traveled

from the Netherlands to the Dominican Republic, where he checked into a hotel in Santo Domingo. Podunajec testified that he was instructed by Watson to visit Epskamp and provide him with $2,000 in cash that the Colombians had given to Watson. He further testified that Watson told him that Epskamp—to whom Watson referred as the "Journalist" or "Journey"—would be traveling to Belgium from the Dominican Republic with "the thousand keys of cocaine." Joint App'x at 193. When Podunajec visited Epskamp at his hotel and provided him with the $2,000, the two had a brief conversation in Dutch, during which Epskamp asked whether he would be leaving soon and whether he would be heading to Africa or Belgium. Podunajec responded that he should ask "Ali"—the Lebanese individual arranging for the shipment in conjunction with Watson—but that he believed Epskamp would be leaving soon for Belgium with "the thousand keys of cocaine." *Id.* Epskamp told Podunajec that he was participating in the scheme to pay off a drug

debt. He further explained that, in order to play his role as courier, he had been instructed to "take the flight, be like a millionaire on the flight," *id.* at 194, and in return his debt would be forgiven and he would be paid an additional 50,000 euros.

Over the next several weeks, Podunajec met repeatedly with both Epskamp and Watson to discuss logistics for the flight. During one such meeting, Podunajec observed Watson give an additional $1,500 to Epskamp. Although the precise date is not clear, at some point during this time period, Podunajec brought Epskamp from his hotel in Santo Domingo to a hotel closer to La Romana Airport. At a subsequent meeting, Watson told Epskamp that he would be departing soon for Belgium.

On December 15, 2011—at 3:45 a.m.—Watson collected Epskamp at the hotel near La Romana Airport. During this time, Watson communicated with "Ali" via BlackBerry Messenger. Ali repeatedly asked Watson about the status of the "Journalist," and

further instructed that the pair put on their "uniforms." *See United States v. Epskamp*, No. 1:12-cr-00120-RJS-2, ECF Docket No. 188 at 200-205.

Watson and Epskamp proceeded to the airport, where they met with the two undercover pilots, one of whom carried an audio and video recording device. Epskamp was, according to the testimony of UC-1, "dressed very, very elegantly, as a gentlemen, as a real executive, with a jacket, a tie, and a scarf." Joint App'x at 254. Watson was dressed to look like a member of the flight crew. *Id.* The pair proceeded through the VIP terminal of La Romana Airport and boarded a charter airplane bearing an "N" registration number on its tail, indicating registration in the United States. On board the aircraft, strewn about the cabin, were approximately 20 suitcases containing over 1,000 kilograms of cocaine that had previously been loaded by the Colombian members of the conspiracy. UC-1 testified that there were so many suitcases in the cabin that he "had to walk

on top of suitcases because the aisles were blocked by them." *Id.* at 257. He further testified that he discreetly opened two or three suitcases and was able to "confirm that there were those square-shaped packages of cocaine that [are] commonly used to pack [narcotics]" within the suitcases. *Id.*

As those onboard the plane waited to depart, an airport official approached the aircraft and informed Epskamp that he had to disembark and speak with an immigration official. Epskamp returned to the terminal while Watson remained on the plane. Dominican police officers then arrested Epskamp and Watson. A subsequent search of the aircraft revealed approximately 1,000 kilograms of cocaine, divided into approximately 1,000 bricks. A number of Epskamp's personal belongings were also found on the plane.

In November 2012, Epskamp was transferred to the United States and brought to the Southern District of New York for trial.

**STANDARD OF REVIEW**

The specific challenges raised by Epskamp that we address in this Opinion concern statutory interpretation and constitutional due process rights. "We review questions of statutory interpretation *de novo*." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006). With respect to a claimed due process violation, "we review the district court's factual determinations for clear error," while "[t]he constitutional significance of those findings, including the ultimate determination of whether due process has been violated, is reviewed *de novo*." *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000).

**DISCUSSION**

**I.** **The District Court Properly Construed 21 U.S.C. § 959(b) to Proscribe Epskamp's Conduct**

Epskamp was convicted for possessing with intent to distribute a controlled substance aboard an aircraft registered in the

United States, a crime under 21 U.S.C. § 959(b)(2), and conspiring to do the same.[6] Section 959(b) specifically states that:

> It shall be unlawful for any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States, to—
>
> (1) manufacture or distribute a controlled substance or listed chemical; or
>
> (2) possess a controlled substance or listed chemical with intent to distribute.

21 U.S.C. § 959(b).

Subsection (c), titled "Acts committed outside territorial jurisdiction of United States; venue" then further explains in relevant part that:

---

[6] Congress amended § 959 on May 16, 2016 to add a new subsection "a," to add a new subsection "b," and to "redesignat[e] subsections (b) and (c) as subsections (c) and (d), respectively." Transnational Drug Trafficking Act of 2015, Pub. L. No. 114–154, § 2, 130 Stat. 387 (2016). Because Epskamp was charged under the previous iteration of the statute, and because the amendments do not substantively change any aspect of the statutory analysis, we shall refer to the statute throughout this opinion as it existed during the course of Epskamp's trial and at the time of his conviction. *See also United States v. Knowles*, —F. Supp. 3d—, 2016 WL 3365373, at *1 n.1 (D.D.C. June 16, 2016) (observing that the Transnational Drug Trafficking Act of 2015 had no substantive impact on the scope of pre-amendment subsections (b) and (c)).

> This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States.

21 U.S.C. § 959(c).

Epskamp raises two arguments with respect to the construction of these provisions. First, he argues that § 959(b)(2) does not extend to extraterritorial conduct because § 959(c) omits reference to possession with intent to distribute. Second, as part of both his sufficiency of the evidence argument and challenge to the District Court's jury instructions, he argues that § 959(b) requires proof of a defendant's knowledge that their unlawful acts occur "on board an aircraft owned by a United States citizen or registered in the United States." We reject both of these arguments.

**A.     Epskamp's Extraterritorial Conduct Fell Within the Scope of § 959(b)**

Epskamp principally argues that because subsection (c) expressly references "acts of manufacture or distribution," as

referenced also in § 959(b)(1), but not possession with intent to distribute, as referenced in § 959(b)(2), the section is best read as applying extraterritorially solely where a defendant is charged with manufacturing or distributing a controlled substance, but not possessing with intent to distribute the same. We reject Epskamp's interpretation of § 959.

### 1. Principles of Statutory Interpretation

In determining whether a federal statute applies extraterritorially, we begin with the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotations omitted).

This presumption is a "canon of construction . . . rather than a limit upon Congress's power to legislate." *Id.* Accordingly, "[t]he presumption against extraterritoriality is only a *presumption;* it is

overcome by clearly expressed Congressional intent for a statute to apply extraterritorially." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) (emphasis in original); *accord United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (recognizing that presumption against extraterritoriality applies to criminal, as well as civil, statutes but that "it is beyond doubt that, as a general proposition, Congress has the authority to enforce its laws beyond the territorial boundaries of the United States" (internal quotations omitted)). Because the presumption is only "a canon of statutory interpretation," *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013), whether Congress evinces an intent for the law to apply extraterritorially is likewise a question of statutory interpretation. *See, e.g.*, *United States v. MacAllister*, 160 F.3d 1304, 1307 (11th Cir. 1998) ("Whether Congress has intended extraterritorial application is a question of statutory interpretation."); *United States v. Thomas*, 893 F.2d 1066, 1068 (9th Cir. 1990) ("Whether 18 U.S.C. § 2251(a)

applies to Thomas' extraterritorial acts is, therefore, a question of statutory interpretation.").

"As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "A particular statute's 'plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" *Id.* (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)).

Generally speaking, "we need proceed no further" than the statute's text and context in the broader statutory scheme. *Id.* Nonetheless, "[e]xtrinsic materials have a role in statutory interpretation . . . to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous

terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

### 2. Analysis

We conclude that § 959(b) applies extraterritorially to acts of possession with intent to distribute.[7] This determination is supported by the structure and context of the statute and, though not necessary to our holding, confirmed by the statute's enactment history. At the outset, we acknowledge, as other courts have, that Epskamp's challenge to the government's construction of § 959 is not wholly without force. *See, e.g. United States v. Bodye*, —F. Supp. 3d—, 2016 WL 1091058, at *2 (D.D.C. Mar. 21, 2016) (acknowledging that the argument that § 959(b)(2) does not extend extraterritorially "appears persuasive at first"). That Congress chose to expressly

---

[7] Although a matter of first impression for our Court, we note that every other federal court to confront this issue has likewise concluded that § 959(b) extends extraterritorially to acts of possession with intent to distribute. *See United States v. Lawrence*, 727 F.3d 386 (5th Cir. 2013); *Knowles*, 2016 WL 3365373, at *5-7; *United States v. Bodye*, —F. Supp. 3d—, 2016 WL 1091058, at *2-4 (D.D.C. Mar. 21, 2016); *United States v. Malago*, No. 12-20031-CR, 2012 WL 3962901, at *2-5 (S.D. Fla. Sept. 11, 2012).;.

refer to distribution, manufacture, and possession with intent to distribute in § 959(b), but only distribution and manufacture in § 959(c), is perhaps an example of less than crystalline drafting. Nonetheless, as the Supreme Court has recently recognized, merely because a statute contains "examples of inartful drafting" does not mean courts are incapable of discerning its meaning, particularly with the aid of broader statutory context. *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015).

Turning first to the operative subsection under which Epskamp was convicted, § 959(b) begins by broadly proscribing various narcotics trafficking offenses committed by "*any* United States citizen on board *any* aircraft, or *any* person on board *any* aircraft owned by a United States citizen or registered in the United States . . . ." 21 U.S.C. § 959(b) (emphases added). This language establishes two classes of defendants, each extremely broad in scope yet retaining a distinct United States nexus: (1) *any* person (as

compared to any United States citizen) provided that they commit the acts on board *any* United States-owned or registered plane <u>and</u> (2) *any* United States citizen aboard *any* aircraft, regardless of registration or ownership. As other courts have observed, this particular formulation of the provision's jurisdictional scope appears calibrated for broad extraterritorial application, while purposefully retaining a distinct nexus to the United States. *See United States v. Knowles*, —F. Supp. 3d—, 2016 WL 3365373, at *6 (D.D.C. June 16, 2016) ("The foundational element of the involvement of a U.S. citizen on board the aircraft, or the U.S. ownership or registry of the aircraft, applies to both subsections 959(b)(1) and (b)(2), and there would have been no reason to premise all of section (b) on this very specific U.S. nexus if only one of the prongs of the section was meant to extend to conduct abroad. So the nexus requirement supports the conclusion that *all* of subsection (b) was meant to reach outside of the United States—indeed that seems to be the goal of the airplane

provisions.").  Yet we are also mindful that, in the typical case, "generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality."  *Kiobel*, 133 S. Ct. at 1665.

Turning to § 959(c), the statute's venue provision states that "[a]ny person who violates *this section* shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia."  21 U.S.C. § 959(c) (emphasis added).  There is no serious dispute that "this section" refers to § 959 as a whole, including both § 959(b)(1) and (b)(2).  *See United States v. Lawrence*, 727 F.3d 386, 393 (5th Cir. 2013) (observing that the venue provision "refers to the violation of any part of the entire section-including § 959(b)").  In other words, the venue provision assumes that defendants under the statute—including those who violate § 959(b)(2)—will usually be tried at their "point of entry" into the

United States, again suggesting that Congress intended the statute as a whole to apply extraterritorially. *Id.*

But other aspects of § 959(c) muddy the textual waters. The subsection contains an express extraterritoriality provision: "This section is intended to reach acts of manufacturing or distribution committed outside the territorial jurisdiction of the United States." As Epskamp emphasizes, § 959(c) mentions only "acts of manufacture or distribution," but not possession with intent to distribute. The doctrine of *expressio unius est exclusio alterius* thus permits, but does not require, us to infer that the exclusion of possession with intent to distribute from § 959(c) impliedly excludes such conduct from the statute's extraterritorial application. *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 370 (2d Cir. 2006) (observing that *expressio unius* canon is merely "an aid to construction," and not conclusive as to Congress's intent (internal quotation marks omitted)); *accord Barnhart v. Peabody Coal Co.*, 537

U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

Ultimately, we need not navigate the textual thicket presented by 21 U.S.C. § 959. Even assuming for the sake of argument that the text of § 959(b) itself is insufficiently plain to overcome the presumption against extraterritoriality, we conclude that the statutory scheme and the context of the statute overcome the presumption against extraterritoriality. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016) ("While the presumption can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential," and "'context can be consulted as well.'" (quoting *Morrison*, 561 U.S. at 265)); *Louis Vuitton Malletier S.A.*, 676 F.3d at 108 ("A particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision

within the context of that statute." (internal quotations omitted)). The nature of § 959 specifically, and the structure of federal statutory narcotics laws generally, render Epskamp's preferred reading of the statute illogical. For instance, reading § 959(c) to limit the scope of § 959(b)(2) would have the peculiar effect of establishing a purely domestic crime within a statute aimed at combatting international narcotics smuggling and importation where every other provision applies extraterritorially.

Further, reading § 959(b)(2) to proscribe only domestic conduct would render it a redundancy within the federal statutory framework. Prior to § 959(b)'s enactment in 1986, 21 U.S.C. § 841(a) already made it unlawful for "any person . . . to manufacture, distribute . . . or possess with intent to . . . distribute" narcotics. In other words, the purely domestic possession of narcotics with intent to distribute was already unlawful at the time of § 959(b)(2)'s enactment and Epskamp does not explain what further application

the provision would have if limited exclusively to domestic conduct.[8] *See, e.g.*, *United States v. Massuet*, 851 F.2d 111, 115 (4th Cir. 1988) (observing, in the context of a case where defendants were arrested after aircraft landed in United States, that "21 U.S.C. § 841(a)(1) is virtually identical to section 959(b)(2) . . . . Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to 'possess with intent to . . . distribute . . . a controlled substance . . .' anywhere the United States has jurisdiction. The elements of the crime denounced in sections 959(b)(2) and 841(a)(1) are similar"). That § 959(b)(2) would otherwise be duplicative of § 841(a) is a "most compelling indication" that Congress intended § 959(b)(2) to have added extraterritorial effect.[9] *Bodye*, 2016 WL

---

[8] That § 959(b) expressly contemplates possession with intent to distribute aboard an aircraft is of no consequence, as the pre-1986 understanding of § 841(a) already criminalized domestic possession with intent to distribute aboard aircraft. *See, e.g.*, *United States v. Freeman*, 498 F.2d 569, 571 (2d Cir. 1974); *United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974); *United States v. Worthington*, 544 F.2d 1275, 1277 (5th Cir. 1977); *United States v. Driscoll*, 632 F.2d 737 (9th Cir. 1980); *United States v. Garcia*, 672 F.2d 1349, 1353 (11th Cir. 1982).

[9] In *Bodye*, Judge Bates further observed that "[a]t the motions hearing, Bodye's counsel suggested that, even without extraterritorial reach, § 959(b)(2) might

1091058, at \*3; *accord Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011) (describing the "canon that statutes should be read to avoid making any provision superfluous, void, or insignificant," (internal quotation marks omitted)).[10]

---

cover certain scenarios involving planes in flight that § 841 does not reach, but he did not actually identify any such scenario. Nor can the Court think of one. In any scenario, the conduct either did or didn't occur within the territorial jurisdiction of the United States; there is no netherworld that Bodye's reading of § 959(b)(2) would reach but § 841 would not." *Bodye*, 2016 WL 1091058, at \*3. We agree with Judge Bates that—but for *extraterritorial* instances involving "any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States," 21 U.S.C. § 959(b)—we are hard-pressed to imagine any scenario where § 959(b)(2) would reach conduct beyond the scope of § 841(a). This augurs strongly in favor of finding that § 959(b)(2) applies extraterritorially. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (rejecting proposed reading of a criminal statute where party could not "explain what independent function [the related statute] would serve if the [party] is right about the sweeping scope of [the statute at issue]"); *id.* ("We resist a reading of [the statute at issue] that would render superfluous an entire provision passed in proximity as part of the same Act").

[10] Indeed, the canon against superfluity applies with even greater force here because the original versions of both § 841(a) and § 959 were enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91–513, § 401, 84 Stat. 1236, 1260–61 (1970). Section 841, the "core provision," of the Act, "made it unlawful to manufacture, distribute, or possess with intent to distribute a controlled substance within the United States," whereas "Section 959, by contrast, included an express extraterritorially provision." *Knowles*, 2016 WL 3365373, at \*5. "So the object behind enacting section 959 was to reach conduct occurring outside the United States *that would not be covered otherwise*." *Id.* (emphasis added). In other words, contrary to the duplicative reading urged by

Finally, although not necessary to our determination, the authoritative legislative history of § 959's enactment strongly confirms our reading of the statute's text and structure. *See* Hon. Robert A. Katzmann, *Statutes*, 87 N.Y.U. L. Rev. 637, 670 (2012) ("[A]uthoritative legislative history can be useful, even when the meaning can be discerned from the statute's language, to reinforce or confirm a court's sense of the text.").

What is now § 959 was first enacted in 1970 as part of the Comprehensive Drug Abuse Prevention and Control Act, Pub. L. 91-513, 84 Stat. 1236 (October 27, 1970). Section 1009 of that Act—the precursor to what is now § 959—contained identical language to

---

Epskamp, the two provisions were deliberately enacted in tandem to complement, rather than copy, one another.

We do not mean to suggest that the presumption against superfluity necessarily trumps, by itself, the presumption against extraterritoriality in every instance. The Supreme Court has suggested that it does not. *See Aramco*, 499 U.S. at 253–54. And although courts "construe statutes to avoid surplusage whenever possible," *Perez v. Westchester Cty. Dep't of Corr.*, 587 F.3d 143, 155 (2d Cir. 2009), "[t]he canon against surplusage is not an absolute rule," *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1177 (2013). We rely on the canon against superfluity here because it consistent with and reinforces our reading of the statute in other respects.

what was, at the time of Epskamp's conviction, codified as §§ 959(a)

and 959(c).  The section, in relevant part, read:

> SEC. 1009. It shall be unlawful for any person to manufacture
> or distribute a controlled substance in schedule I or II—
>
> (1) intending that such substance be
>     unlawfully imported into the United
>     States; or
>
> (2) knowing that such substance will be
>     unlawfully imported into the United
>     States.
>
> *This section is intended to reach acts of manufacture or distribution*
> *committed outside the territorial jurisdiction of the United States.*

*Id.* (emphasis added).  In other words, although the statute did not

yet contain the aircraft provisions at issue in this appeal, the

provision plainly applied extraterritorially in its entirety.  Indeed,

those federal appeals court cases discussing this predecessor to § 959

noted its obvious extraterritorial scope.  *See, e.g., United States v.*

*King*, 552 F.2d 833, 850 (9th Cir. 1976) ("[T]he statute is expressly

aimed at having extraterritorial effect . . . ."); *United States v. Hayes*,

653 F.2d 8, 15 (1st Cir. 1981) ("In any event, another provision of the 1970 statute, making it a crime to manufacture or distribute a controlled substance for purposes of unlawful importation into the United States expressly applies to extraterritorial activity. *See* 21 U.S.C. § 959. The related provision before us contains no such express statement."); *United States v. Perez-Herrera*, 610 F.2d 289, 290 (5th Cir. 1980) (citing § 959 in noting that "a penal statute may clearly indicate that it governs extra-territorial conduct").

In 1986, Congress enacted the Anti-Drug Abuse Act of 1986, Pub. L. 99-570, 100 Stat. 3207 (1986).[11] The Act split the prior version of the statutory text into subsections (a), titled "Manufacture or Distribution for Purpose of Unlawful Importation," and (c), titled "Acts Committed Outside Territorial Jurisdiction of United States;

---

[11] As the government observes in its brief, Congress made several findings with respect to the Act, including that American anti-drug policy required "increased emphasis on stopping narcotics traffickers in countries through which drugs are transshipped" and "increased emphasis on the interdiction of drugs and drug smugglers at the borders of the United States, in the air, at sea, and on the land." Pub. L. 99–570, § 3002, 100 Stat 3207, 3207-73..

Venue." The 1986 Act also added a new subsection (b)—"Possession, Manufacture, or Distribution By Person On Board Aircraft." *Id*. It is impossible to discern any possible reason as to why Congress, if it actually intended § 959(b)(2) to apply solely to domestic conduct, elected to place such a provision within an existing statute that was expressly and wholly extraterritorial in nature, coupled with another new subsection—§ 959(b)(1)—that was likewise intended to apply extraterritorially. The far more reasonable inference is that Congress, believing the statute to already clearly apply extraterritorially in its entirety, added the 1986 amendments concerning aircraft with the understanding that they, too, would apply extraterritorially. *See Bodye*, 2016 WL 1091058, at *3 (noting that "the entirety of the original § 959 applied extraterritorially" and therefore Congress "might have casually assumed that a new subsection would as well"); *Knowles*, 2016 WL 3365373, at *6 ("And the fact that the new provision was inserted in

the particular section of [the statute] that was already extraterritorial in its entirety lends further support to the notion that Congress expected it to have a similar reach.").

In sum, the structure, context, and authoritative history of the statute reveal Congress's clear intent that the statute apply extraterritorially in its entirety, including with respect to Epskamp's conduct.

**B.      Section 959(b) Does Not Require a Defendant's Knowledge of the Jurisdictional Element**

Epskamp next argues that a non-citizen defendant can only be liable under § 959(b) if they know that the aircraft upon which they are committing unlawful acts is registered in the United States or owned by a United States citizen.  He contends the government failed to adduce sufficient evidence that he possessed such knowledge and further argues that the District Court erred in instructing the jury that, in order to find him guilty, "the defendant need not know that the narcotics would be or were possessed on

board an aircraft that was registered in the United States" and again that "[t]he defendant doesn't have to know that the aircraft was registered in the United States." Joint App'x at 283-84. We disagree and conclude both that the District Court's instructions appropriately reflected the law and that, accordingly, the government was not required to adduce evidence of Epskamp's knowledge concerning the aircraft's registration.[12]

Simply stated, nothing in the statute obliges the government to prove that Epskamp knew the aircraft was registered in the United States. To be sure, § 959(b) does contain a jurisdictional

---

[12] Epskamp did not object to the challenged jury charge below and, accordingly, his claim on appeal is waived or forfeited. *See, e.g.*, *Fogarty v. Near N. Ins. Brokerage, Inc.*, 162 F.3d 74, 79 (2d Cir. 1998) ("A party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal."). Indeed, the very instructions to which Epskamp now objects on appeal were included in the Joint Proposed Requests to Charge he submitted to the District Court in tandem with the government. *See United States v. Epskamp*, No. 1:12-cr-00120-RJS-2, ECF Docket No. 167. Epskamp cannot—and indeed, does not even attempt to—meet his burden of showing plain error in the District Court's instructions. *See, e.g.*, *United States v. Feliciano*, 223 F.3d 102, 115 (2d Cir. 2000); *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001). Nonetheless, we address this issue because it bears not only upon the District Court's jury instructions, but also Epskamp's challenge to the sufficiency of the evidence.

component; it limits its application to "any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States." 21 U.S.C. § 959(b).  But we have "repeatedly . . . refused to find knowledge of the jurisdictional fact to be an essential element in prosecutions under" various criminal statutes requiring, for instance, that the criminal acts affect interstate or foreign commerce.  *United States v. Eisenberg*, 596 F.2d 522, 526 (2d Cir. 1979) ("The element of interstate transportation is merely a jurisdictional element, for which proof of the fact of transportation is proof enough."); *see also United States v. Green*, 523 F.2d 229, 233-34 (2d Cir. 1975) ("A substantive violation of 18 U.S.C. § 659 does not require knowledge of the interstate or foreign character of the goods.  It is therefore unnecessary to prove such knowledge in order to establish a conspiracy violation." (internal citations omitted)); *United States v. Herrera*, 584 F.2d 1137, 1150 (2d Cir. 1978) ("Substantive cases brought under [18 U.S.C.] §

1952 have been uniform in their holdings that it is unnecessary to prove a defendant had actual knowledge of the jurisdictional element, and that he actually agreed and intended to use interstate facilities to commit a crime.").

The obvious exception to this rule is when the statute itself *requires* knowledge of the jurisdictional element.  Such is the case with *other* subsections in the current version of § 959, which proscribe, for instance, the manufacture or distribution of chemicals "knowing, or having reasonable cause to believe that the controlled substance will be unlawfully imported into the United States."  21 U.S.C. § 959(a).[13]  Epskamp disproves his own argument by citing to *United States v. Londono-Villa*, 930 F.2d 994, 999 (2d Cir. 1991), in

---

[13] This language was added to § 959(a) as part of the Transnational Drug Trafficking Act of 2015. *See supra* note 6.  Substantively identical language, included as part of the statute's original enactment in 1970 and remaining after the 1986 amendments, existed at the time of Epskamp's conviction. *See* Comprehensive Drug Abuse Prevention and Control Act, Pub. L. 91-513, 84 Stat. 1236 (October 27, 1970) ("SEC. 1009. It shall be unlawful for any person to manufacture or distribute a controlled substance in schedule I or II— (1) *intending* that such substance be unlawfully imported into the United States; or (2) *knowing* that such substance will be unlawfully imported into the United States." (emphases added)).

which we reversed a conviction under § 959(a) because the government failed to "establish that the defendant knew the narcotics were to be imported into the United States." But in *Londono-Villa*, we observed that the government was only required to prove that knowledge "[i]n light of Congress's conjoining the knowledge/intent requirement with the term 'import'" within that particular subsection. *Id.* at 998. We also stated that Congress could have used "one of its other formulations that would plainly reach all actors outside of the United States who contribute to the international movement of narcotics *regardless of their knowledge or intent as to destination*." *Id.* (emphasis added). Congress used just such a formulation in § 959(b) and, accordingly, there was no need for the government to establish that Epskamp knew the aircraft was registered in the United States.

**II.  Prosecution of Epskamp in the United States Did Not Violate Due Process**

Epskamp also argues that, even if § 959(b)(2) can be read to proscribe his conduct, application of the statute in this particular instance would violate his constitutional right to due process of law. He largely reiterates his arguments with respect to the statutory text, contending that it violates due process both to prosecute his extraterritorial conduct and to prosecute him in the United States due to his ostensible ignorance of the aircraft's registration in this country. We again reject these arguments and conclude that prosecution of Epskamp within the United States was consistent with due process.

**A.  A Sufficient Nexus Existed Between Epskamp's Extraterritorial Conduct and the United States**

In *United States v. Yousef*, we adopted the Ninth Circuit's "sufficient nexus" test for determining whether the extraterritorial application of federal criminal law comported with constitutional

due process.  Accordingly, "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990)).  "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."  *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *cf. United States v. Ali*, 718 F.3d 929, 946 (D.C. Cir. 2013) (noting that *Al Kassar* "only tells us when such a nexus exists, not when it is absent").  Where Congress expressly intends for a statute to apply extraterritorially, as we conclude it did here, the "burden is a heavy one" for a defendant seeking to show that

extraterritorial application of the statute violates due process. *Ali*, 718 F.3d at 944 n.7.[14]

Epskamp contends that no sufficient nexus exists in the present case because his conduct occurred outside the United States and was not intended to cause harm within the United States. We disagree. The government's evidence showed that the conspirators deliberately sought out a United States-flagged aircraft in order to avoid the scrutiny to which they were subjected when initially using a Dominican-flagged aircraft. *See* Joint App'x at 245. UC-1, one of the undercover pilots, testified that he flew to Miami to arrange for the rental of a "cold plane," meaning that it did not have any

---

[14] Indeed, only one reported federal appellate case has held that an insufficient nexus existed in an instance where Congress expressly intended a statute to apply extraterritorially. *See United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006). But in *Perlaza*, there was no evidence that the narcotics seized aboard a foreign-flagged vessel manned by a foreign crew had any connection at all to the United States. Irrespective of due process concerns, such facts would fail to meet § 959(b)'s statutory requirement that the extraterritorial conduct involve a "United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States." 21 U.S.C. § 959(b). Thus, the instant case is factually and legally distinguishable from *Perlaza*.

problems with the authorities and was not suspected of drug

smuggling.  *See United States v. Epskamp*, No. 1:12-cr-00120-RJS-2,

ECF Docket No. 190 at 285, 430-33.  The United States plainly has an

interest in prosecuting narcotics conspiracies that dispatch

participants into the United States in order to secure United States-

registered aircraft with the deliberate intent to exploit the perceived

authority and lawfulness of such aircraft.  *Cf. Al Kassar*, 660 F.3d at

119 ("If an undercover operation exposes criminal activity that

targets U.S. citizens or interests or threatens the security or

government functions of the United States, a sufficient jurisdictional

nexus exists notwithstanding that the investigation took place

abroad and focused only on foreign persons.").

        **B.**     **Epskamp's Ignorance of the Aircraft's Registration in the United States Does Not Implicate Due Process**

Epskamp further argues that, even if the United States does

have an interest in prosecuting crimes aboard United States-

registered aircraft, due process bars prosecution of him in this case

because he was ignorant of this particular aircraft's country of origin. He contends that he therefore did not receive fair warning that he faced prosecution in the United States. Not so. Knowledge of the aircraft's country of registration is legally irrelevant for purposes of due process. "The idea of fair warning is that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Al Kassar*, 660 F.3d at 119 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id*; *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) ("Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment

of persons apprehended with narcotics on the high seas.").  Here, Epskamp's behavior was "self-evidently criminal," *see Al Kassar*, 660 F.3d at 119, and he had every reason to anticipate prosecution for his conduct.[15]  In sum, no due process violation occurred when Epskamp was haled into United States court.

**CONCLUSION**

In sum, for the foregoing reasons and the reasons stated in the separate summary order filed today, we AFFIRM the judgment of the District Court.

---

[15] The sole case upon which Epskamp relies, *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1127 (N.D. Cal. 2015), is irrelevant.  In that case, the District Court first determined that the criminal statutes at issue—including, *inter alia*, bribery under 18 U.S.C. § 666(a) and wire fraud under 18 U.S.C. § 1343—did not, by their own terms, apply extraterritorially, effectively rendering its alternative due process holding *obiter dicta*.  *See Sidorenko*, 102 F. Supp. 3d at 1127.  Even considering its due process analysis for its persuasiveness, the case is plainly distinguishable, not least of all because § 959 is expressly intended to apply extraterritorially to combat international narcotics smuggling, whereas the bribery and wire fraud statutes in *Sidorenko* were aimed at domestic conduct.  Further, the defendant in *Sidorenko* was a non-citizen whose conduct entirely took place abroad without the aim of harming an interest of the United States.  *Id.* at 1133.  Here, Epskamp's conduct occurred aboard a United States-registered aircraft that was itself directly retrieved from the United States by a perceived member of the conspiracy.