

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-21-2003

# USA v. Ledesma-Cuesta

Precedential or Non-Precedential: Precedential

Docket No. 02-1827

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation
"USA v. Ledesma-Cuesta" (2003). *2003 Decisions.* Paper 157.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/157

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1827

UNITED STATES OF AMERICA

v.

DIODAYAN LEDESMA-CUESTA,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Judge: The Honorable Stewart Dalzell
(D.C. No. 01-cr-00374-1)

Submitted Under Third Circuit L.A.R. 34.1(a)
June 2, 2003

Before: BARRY, FUENTES, and ROSENN, *Circuit Judges*

(Opinion Filed: October 17, 2003)

Robert K. Reed
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

Hope C. Lefeber
1420 Walnut Street
Suite 1000
Philadelphia, PA 19102

*Counsel for Appellant*

## OPINION OF THE COURT

*FUENTES*, Circuit Judge:

During passage from Colombia to Philadelphia, about 400 miles north of the Bahamas in the mid-Atlantic, the crew of a merchant ship, the Trojan Star, discovered defendant, Diodayan Ledesma-Cuesta (hereinafter "Ledesma") and approximately four kilos of cocaine aboard their vessel. When the ship arrived in Philadelphia, the crew handed the defendant and the drugs over to United States Customs officials. Ledesma was prosecuted and convicted in the U.S. District Court for, among other things, possession and attempted possession with intent to distribute cocaine on a vessel subject to the jurisdiction of the United States in violation of the Maritime Drug Law Enforcement Act (MDLEA). On appeal, he claims that the United States lacked jurisdiction over the vessel at the time the cocaine was seized and, therefore, the District Court lacked jurisdiction over his crime under the MDLEA. We disagree. Although the defendant's drug possession occurred in international waters, he planned to possess the drugs and distribute them as the vessel continued into U.S. waters. We thus conclude that the District Court properly exercised jurisdiction. The conviction and sentence will be affirmed.

### I. *Background*

#### A. *Factual*

On May 29, 2001, the Trojan Star, a merchant ship carrying bananas, set out from Turbo, Colombia en route to Philadelphia, Pennsylvania. Although the ship was registered in the Bahamas and had "Nassau," the Bahamian capital, inscribed on the stern, the ship had not sailed to the Bahamas during the previous four years. Rather, prior to June 2001, the Trojan Star had been transporting fruit on a bi-weekly basis for approximately

four years between Philadelphia and Colombia, S.A., with intervening calls at Port Canaveral, Florida, and Costa Rica.[1]

In late May 2001, when the Trojan Star arrived at Turbo, Colombia, the ship anchored more than a mile out to sea. None of the crew disembarked at Turbo. Colombian barges loaded with cargo sailed out to the Trojan Star, where Colombian stevedores hoisted crates containing approximately 25 million bananas onto the ship. The bananas were stored on one of four decks located below the main deck of the ship. After leaving Turbo, the Trojan Star sailed to Santa Marta, where additional fruit was loaded onto the ship. On May 30, 2001, the same day the ship arrived in Santa Marta, the Trojan Star set out for Philadelphia, traveling in an essentially northerly straight line.

On or about June 2, 2001, while the ship was in international waters approximately 400 miles and 20 hours by sea northwest of the Bahamas in the mid-Atlantic, Third Officer Jeffree Monton ("Monton"), a crew member of the ship, approached Mast House # 2, which provided access to certain decks where bananas were stored. When Monton opened the door to Mast House # 2, he discovered a stowaway, later identified as defendant Ledesma, standing on a narrow ten-inch wide ledge about ten feet off of the ground. The small area where Ledesma was apprehended was part of the ventilation area of the ship. Monton immediately closed the door and ordered nearby crew members to guard the door, so that he could go inform Captain John Dobson ("Dobson") and Chief Engineer David Peck ("Peck") of the stowaway's presence on board the ship.

After being notified of Ledesma's presence, Peck went to Mast House # 2 and persuaded Ledesma to come down from the ledge. Ledesma was then escorted by crew members to a secured cabin in which he was detained for the remainder of the journey. In the meantime, Peck searched Mast House # 2, and in a gutter almost fourteen feet above the floor, he found a belt containing eight

---

1. The testimony at trial established that many merchant vessels are registered in the Bahamas or in Monrovia, Liberia, but that registry has no relationship to the vessels' travel routes.

pouches that held more than four kilograms of cocaine, a pocketknife, a lighter, a flashlight with Colombian-manufactured batteries, other various tools, a can of condensed milk, two bottles of water, one block of processed food and four tins of food, and two bags of fruit (these items were all admitted into evidence). According to Chief Engineer Peck and Captain Dobson, the food and equipment were not of the type that would be used by crew members on the Trojan Star, evidence from which the jury could infer that Ledesma brought the items aboard.

Additional searching led crew members to discover the manner in which Ledesma gained access to Mast House # 2: the wire grid across the return air space had been cut, the hatch from one deck to another was slightly open, and an empty water bottle was found on one of the decks on top of the cargo. After the ship arrived in Philadelphia, Captain Dobson observed a series of pallets that had been knocked out to create a passageway to Mast House # 2.

Approximately 25 minutes after Ledesma was removed from Mast House # 2, Captain Dobson interviewed Ledesma who explained that he boarded the ship in Turbo, Colombia during a heavy rain storm. He explained that he was able to enter the ship because he was on one of the barges delivering fruit to the vessel and climbed up a barge mooring rope. He admitted to having worked as a stevedore in the past, although he claimed that he did not receive help from any stevedores in boarding the Trojan Star. He did admit, however, that in 1983, he had stowed aboard a ship from Colombia to Florida but had been deported from the United States in 1997. Captain Dobson asked Ledesma to remove the contents of his pockets, and Ledesma responded by offering the captain $300 in cash if he would let Ledesma get off in Philadelphia.

Late on June 3, 2001, the Trojan Star entered the customs waters of the United States and approximately six hours later, on June 4, the ship docked in Philadelphia. At that time, Captain Dobson turned Ledesma over to United States Customs Service Special Agent James Zagorski, together with all of the evidence, including the cocaine, clothing, food, and tools.

B. *Procedural*

On June 28, 2001, a grand jury returned a single-count indictment charging Ledesma with reentry after deportation. On August 2, 2001, the grand jury returned a superseding indictment which added the charges of possession with intent to distribute cocaine and importation of cocaine. On October 11, 2001, the grand jury returned a second superseding indictment charging Ledesma as follows: Count One, possession and attempted possession of more than 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1); Count Two, importation and attempted importation of more than 500 grams of cocaine in violation of 21 U.S.C. §§ 952(a), 960(a), and 963; Count Three, possession and attempted possession with intent to distribute more than 500 grams of cocaine on a vessel subject to the jurisdiction of the United States, in violation of 46 App.U.S.C. §§ 1903(a), (c)(1)(D), and (j); and Count Four, reentry and attempted reentry to the United States after deportation, in violation of 8 U.S.C. §§ 1326(a) and (b)(2).

On December 19, 2001, a jury convicted Ledesma on all counts of the second superseding indictment. On March 22, 2002, the District Court sentenced Ledesma to 360 months incarceration followed by an eight-year period of supervised release and imposed a $2,500 fine and a $300 special assessment. Ledesma filed post-trial motions for judgment of acquittal and a new trial pursuant to Rule 29. The District Court denied the motions, but vacated the conviction on Count One, finding that it was a lesser included offense of Count Two. On March 25, 2002, Ledesma filed a timely notice of appeal.

## II. *Jurisdiction and Standard of Review*

The District Court had subject matter jurisdiction over this case pursuant to 18 U.S.C. §§ 3231 and 3241. We exercise jurisdiction under 28 U.S.C. § 1291 over a final judgment of a district court. Because the resolution of this appeal depends on the application of legal precepts, our standard of review is plenary. *E.g., United States v. Best*, 304 F.3d 308, 311 (3d Cir. 2002).

### III. *Discussion*

A. *Jurisdiction Under the MDLEA*

On appeal, Ledesma contends that the District Court erred in finding jurisdiction over Count Three, charging a violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 App.U.S.C. § 1901, et seq.[2] Specifically, Ledesma argues that the Bahamian ship on which he was apprehended was not a "vessel subject to the jurisdiction of the United States" within the context of the statute.

The MDLEA states in pertinent part:

> (a)  It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a citizen of the United States or a resident alien of the United States on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute a controlled substance.
>
> . . .
>
> (j)  Any person who attempts or conspires to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

46 App.U.S.C. § 1903(a), (j). The definition of "vessel subject to the jurisdiction of the United States" includes "a vessel located within the customs waters of the United States." 46 App.U.S.C. § 1903(c)(1)(D). The parties do not dispute that Ledesma was apprehended by the Trojan Star crew in international waters, but was not arrested until he was in the Philadelphia harbor, well within U.S. customs waters.[3]

---

2. Ledesma also claims that there was insufficient evidence to support the convictions on Counts Two, Three and Four. As we note in Part III.B, this claim has no merit.

3. According to Captain Dobson, the "customs waters" of the United States are three miles of water from any point of land out to sea, and the "territorial waters" extend to a 12-mile limit.

Ledesma observes that the Trojan Star was registered in the Bahamas and the Government presented no evidence at trial with regard to any consent or waiver by the flag nation to the enforcement of United States law by the United States. Ledesma also notes that he was apprehended and dispossessed of the cocaine before he reached United States customs waters. Therefore, Ledesma concludes, the Trojan Star did not meet any of the requirements for being "subject to the jurisdiction of the United States" under the MDLEA. 46 App.U.S.C. § 1903(c).

We disagree. Even though Ledesma's cocaine was taken from him and he was detained before he entered U.S. customs waters, he was clearly attempting to enter the United States with four kilos of cocaine for distribution in the United States when the crew of the Trojan Star discovered him on board their ship. As quoted above, attempted possession with intent to manufacture or distribute is equivalent to actual possession for purposes of the MDLEA. 46 App.U.S.C. § 1903(j). Indeed, as we have noted, Count Three of the indictment explicitly charged Ledesma with attempted possession with intent to distribute more than 500 grams of cocaine aboard a vessel subject to the jurisdiction of the United States.

Under federal law, attempt requires intent and "conduct amounting to a 'substantial step' towards the commission of the crime." *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003). In this case, the question is whether Ledesma's conduct up to the point of his discovery by the crew amounted to a substantial step toward possessing cocaine with an intent to enter the United States to distribute the cocaine. We conclude that it did. The evidence in this case clearly established that Ledesma, possessing a large amount of cocaine, knowingly boarded a vessel headed for Philadelphia. Specifically, the jury could have inferred from Ledesma's past experience as a stevedore that he knew of the Trojan Star's well-established route to Philadelphia, and it could certainly have relied upon his attempt to bribe the Trojan Star captain to let him disembark in Philadelphia. In light of his evidenced attempt to reach U.S. territorial waters covertly to distribute cocaine, the fact that he was discovered before he actually reached U.S. customs waters

in possession of the cocaine is irrelevant. Under Ledesma's argument to the contrary, a drug courier could never be prosecuted for an attempt to bring drugs into the United States aboard a ship under 46 App.U.S.C. § 1903(j), if he were fortunate enough to be discovered before entering U.S. customs waters.

Such a result would directly contradict Congress' stated purpose in drafting the MDLEA. The MDLEA was enacted "to facilitate enforcement by the Coast Guard of laws relating to the importation of illegal drugs" because "the Comprehensive Drug Abuse and Control Act of 1970 . . . inadvertently contained a section repealing the criminal provision under which drug smugglers apprehended on the high seas were prosecuted without creating a new provision to replace it." S. Rep. No. 96-855, at 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2785, 2785. According to the Senate Report, "most of the [Coast Guard's] difficulties in drug enforcement stem[med] from this statutory void which [did] not proscribe possession of controlled substances on the high seas, while such conduct [was] a crime in U.S. territory." *Id.*

In essence, Congress enacted the MDLEA to strengthen the United States' drug laws in areas not adequately addressed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, specifically by removing geographical barriers which had impeded efforts to combat the drug trade. In subsequent amendments to the MDLEA, Congress attempted to bolster the law by: (1) broadening its jurisdiction to deal with "defendants . . . [who had] been relying heavily on international jurisdictional questions as legal technicalities to escape conviction;" and (2) adding the offenses of attempt and conspiracy to bring the law into conformity with the treatment of those offenses in other statutes. S. Rep. No. 99-530, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5986, 6000; H.R. Rep. No. 101-681, pt. 1 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6606. These attempts are explicitly reflected in 46 App.U.S.C. § 1903(h), which states: "This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States." In *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir.

1993), we noted that Congress had authority to enact 46 App.U.S.C. § 1901, et seq., pursuant to its constitutional power to:

> "define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations." Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is "fundamentally unfair" for Congress to provide for the punishment of persons apprehended with narcotics on the high seas.

*Id.* (quoting from U.S. Const. art. 1, § 8, cl. 10). The case before us, then, is the exact type of case the MDLEA was designed to address: one in which the defendant is caught on the high seas, with drugs intended for illegal distribution once he reaches U.S. territory.

Our conclusion is bolstered by the Second Circuit's decision in *Yousef.* In that case, the defendants were charged with attempting to violate 18 U.S.C. § 32(a), which prohibits damaging aircraft in the "jurisdiction of the United States." *Yousef,* 327 F.3d at 86. The prosecution's evidence on the attempt charges consisted of proof of several acts, including bombings, perpetrated by defendants in the Philippines. The defendants pointed out that none of their alleged actions took place in the United States or on a U.S. aircraft. *Id.* at 134. The Second Circuit found this fact irrelevant to their attempt convictions, reasoning that because the acts amounted to substantial steps toward an eventual attack on an aircraft within U.S. jurisdiction, their locale was irrelevant. *Id.*

Similarly, in this case, by the time Ledesma was apprehended, he had already taken substantial steps toward possessing with intent to illegally distribute the cocaine in U.S. customs waters, making his actual location at the time of apprehension immaterial. The crew of the Trojan Star could not have acted more properly. Certainly, it would be unreasonable to have expected the crew to stand by and allow Ledesma to retain the drugs until the ship entered U.S. waters. Ledesma knew when he boarded the Trojan Star that it was bound for Philadelphia, and he cannot avoid the impact of United States laws merely on

the fortuity that he was caught *before* the ship entered U.S. waters rather than afterward. A decision to the contrary would not only undermine law enforcement efforts to arrest drug smugglers, but would discourage crews aboard ships in international waters from apprehending drug traffickers found aboard their vessels who are intent on distributing drugs in the United States. Accordingly, we find no error in the District Court's denial of Ledesma's motion for judgment of acquittal on Count Three.

B.  *Sufficiency of the Evidence and Expert Testimony*

Ledesma raises two other issues on appeal. First, he claims that there was insufficient evidence to support the jury's verdict on Counts Two, Three and Four. Next, he contends that the District Court erred in allowing expert testimony that possession of approximately four kilograms of cocaine was consistent with distribution and not personal use. After a careful review of the record and the arguments presented, we discern no basis for disturbing the District Court's rulings on these issues.

## IV.  *Conclusion*

Accordingly, for the reasons stated above, we affirm the judgment of the District Court.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals for the Third Circuit*