18-671(L)
United States v. Alarcon Sanchez

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: August 27, 2019                    Decided: August 27, 2020)

Docket Nos. 18-671, 18-1231

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

DANIEL GERMAN ALARCON SANCHEZ,
AKA RUTILLO, CARLOS ALBERTO SALINAS
DIAZ

*Defendants-Appellants.* [1]

_____

Before: WINTER, POOLER, and RAGGI, *Circuit Judges*.

Appeal from the United States District Court for the Southern District of

New York (Paul G. Gardephe, *J*.), convicting defendants, after a plea of guilty, of

---

[1] The Clerk of Court is directed to amend the caption as above.

conspiring to engage in drug trafficking activity in violation of the Maritime

Drug Law Enforcement Act (the "MDLEA"), 46 U.S.C. § 70501 *et seq.*

Defendants challenge the adequacy of their unconditional guilty pleas on

the basis that the government has failed to establish as a factual matter that it

complied with the MDLEA's jurisdictional provision requiring that the

interdicted vessel in this case be "stateless." Despite having entered

unconditional guilty pleas, defendants may assert what is concededly an unusual

sufficiency challenge on appeal because we have previously held that the

government's failure to establish statelessness renders a defendant's underlying

plea to MDLEA charges defective under Rule 11. *See United States v. Prado*, 933

F.3d 121, 153 (2d Cir. 2019) (vacating convictions and guilty pleas where "the

government was unable to demonstrate" statelessness and "there was no

mention of . . . statelessness during the plea proceedings"). Defendants

additionally advance various constitutional challenges to the MDLEA and to its

application to land-based conspirators who have never set foot on the vessel

during the scope of the conspiracy.

We hold that the government has met its evidentiary burden in

establishing that defendants' boat, the *El Vacan*, was a stateless vessel and thus

2

subject to the jurisdiction of the United States. We also hold that Section 70506(b) of the MDLEA encompasses land-based conspiratorial conduct, which Congress is authorized to proscribe under the Necessary and Proper Clause. Although due process requires a sufficient nexus with the United States for those not on board a stateless vessel to be prosecuted under the MDLEA, we conclude that in this instance, defendants' prosecutions satisfy due process. Finally, we hold that Congress did not exceed its legislative authority in enacting the MDLEA pursuant to the Define and Punish Clause.

Affirmed.

_____

IAN WEINSTEIN, Lincoln Sq. Legal Services, Inc., (Michael W. Martin, Bronwyn Roantree, *on the brief*), New York, NY, *for Defendant-Appellant Daniel German Alarcon Sanchez.*

MARLON G. KIRTON, New York, NY, *for Defendant-Appellant Carlos Alberto Salinas Diaz.*

JASON M. SWERGOLD, Assistant United States Attorney (Amanda Houle, Karl Metzner, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

POOLER, *Circuit Judge*:

Appeal from the United States District Court for the Southern District of New York (Paul G. Gardephe, *J.*), convicting defendants, after a plea of guilty, of conspiring to engage in drug trafficking activity in violation of the Maritime Drug Law Enforcement Act (the "MDLEA"), 46 U.S.C. § 70501 *et seq.*

Defendants challenge the adequacy of their unconditional guilty pleas on the basis that the government has failed to establish as a factual matter that it complied with the MDLEA's jurisdictional provision requiring that the interdicted vessel in this case be "stateless." Despite having entered unconditional guilty pleas, defendants may assert what is concededly an unusual sufficiency challenge on appeal because we have previously held that the government's failure to establish statelessness renders a defendant's underlying plea to MDLEA charges defective under Rule 11. *See United States v. Prado*, 933 F.3d 121, 153 (2d Cir. 2019) (vacating convictions and guilty pleas where "the government was unable to demonstrate" statelessness and "there was no mention of . . . statelessness during the plea proceedings"). Defendants additionally advance various constitutional challenges to the MDLEA and to its

4

application to land-based conspirators who have never set foot on the vessel during the scope of the conspiracy.

We hold that the government has met its evidentiary burden in establishing that defendants' boat, the *El Vacan*, was a stateless vessel and thus subject to the jurisdiction of the United States. We also hold that Section 70506(b) of the MDLEA encompasses land-based conspiratorial conduct, which Congress is authorized to proscribe under the Necessary and Proper Clause. Although due process requires a sufficient nexus with the United States for those not on board a stateless vessel to be prosecuted under the MDLEA, we conclude that in this instance, defendants' prosecutions satisfy due process. Finally, we hold that Congress did not exceed its legislative authority in enacting the MDLEA pursuant to the Define and Punish Clause.

## BACKGROUND

### I. Factual Background

In early 2015, special agents from the Department of Homeland Security undertook an investigation of a suspicious money transfer from a Colombian drug cartel to a bank account in New York City. That investigation eventually

turned up information about a planned shipment of cocaine from Colombia to Australia scheduled for April 14, 2015.

The investigation also revealed that defendants-appellants Carlos Alberto Salinas Diaz and Daniel German Alarcon Sanchez, along with Luis Fernando Uribe Franco, were working with the cartel and a cooperating source to coordinate the shipment. The cooperating source was introduced to Salinas Diaz and Alarcon Sanchez through a Colombian informant who told Salinas Diaz that the source could help launder cartel money. In February 2015, at a restaurant in Bogota, Colombia, the source met with Salinas Diaz and Alarcon Sanchez where they formally asked for his help. The source told them he had connections with a shipping company that could provide the necessary logistical assistance for the narcotics transport.

At the direction of Homeland Security, the cooperating source agreed to arrange for a vessel. Salinas Diaz and Alarcon Sanchez gave him three passports of cartel associates who would accompany the drugs at sea. On February 13, 2015, the source told Salinas Diaz that he had secured the use of a U.S.-registered vessel. The men agreed that, on April 14, Salinas Diaz would bring the cocaine on two speedboats to an agreed-upon location in the Pacific Ocean where it

would be loaded onto the cooperating source's vessel for shipment to Australia. Unbeknownst to Salinas Diaz and Alarcon Sanchez, the two operators of the U.S.-registered vessel were undercover agents. On April 6, Salinas Diaz discussed the time, date, and location of the planned cocaine transfer with the undercover agents.

On April 7, Salinas Diaz and the cooperating source discussed having Uribe Franco meet the source in New York City to deliver $3,000 in exchange for Australian visas. Uribe Franco sent his son to make the payment in person.

On April 14, a U.S. Navy helicopter assigned to the frigate U.S.S. Kaufmann was patrolling an area approximately 135 nautical miles off the coast of Costa Rica. Navy personnel in the helicopter eventually spotted one of the two speedboats—the *El Vacan*—a vessel colloquially known as a "go-fast." They observed bales on the vessel's deck, some of which the crew members began throwing overboard. The helicopter ordered the *El Vacan* to halt. The go-fast ignored the order. Naval personnel then fired warning shots, and the *El Vacan* stopped. The frigate dispatched a small boat of U.S. Navy and U.S. Coast Guard personnel to fetch the jettisoned packages and prepared a boarding team. In all, nearly 550 kilograms of cocaine were recovered from the water and the vessel.

Meanwhile, the boarding team wrested control of the vessel where they found four crewmembers: Alexander Catano Aragon, Biojo Torres Robinson Gabriel, Jorge Caveza Valencia, and Jhon Carlos Hurtado Rendon.

The boarding team reported that there was no visible registration number on the vessel, but there was a small Ecuadorian flag—either painted or a decal—by the engine. The crewmembers claimed to be Colombian citizens. At the Navy personnel's request, Rendon, the self-identified captain, told the boarding team that the *El Vacan* was an Ecuadorian vessel with a home port of Puerto Manta, Ecuador.

Pursuant to a treaty between the United States and Ecuador, the U.S. Coast Guard contacted Ecuadorian authorities and requested confirmation or denial as to the nationality of the *El Vacan*. The United States told Ecuadorian officials, in relevant part: (1) the vessel was named the *El Vacan*; (2) the vessel lacked registration markings; (3) that the *El Vacan* was spotted by helicopter; (4) that the master claimed it was of Ecuadorian nationality with a home port of Puerto Manta, Ecuador; (5) that it was a 9.6 meters-long "panga," the local word for a go-fast; (6) its coordinates; (7) its color and that it was made of fiberglass; (8) that it was on a route consistent with drug smuggling operations; (9) information

about the vessel's master, Rendon, including his nationality (Colombian), date of birth, and passport number; (10) the number of people on board as well as their nationality (Colombian); (11) that the crewmembers claimed that the purpose of their voyage was a search and rescue of a friend at sea; (12) that the master had little knowledge of fishing; (13) that the vessel was on an erratic course when approached; (14) that crewmembers were seen jettisoning bales that testified positive for cocaine; (15) that the crewmembers were the subject of an ongoing criminal investigation by the United States; and (16) that the crewmembers claimed they departed from Puerto Esmeraldas, Ecuador, on April 12, 2015, and planned to return on April 14, 2015.

The Ecuadorian Coast Guard acknowledged receipt of the request, stating that it would provide a Form 3[2] within thirty minutes. The Ecuadorian authorities requested photographs of the *El Vacan* and the names and identification documents of its crew because there were other boats registered with the same name. The United States did not send the requested information.

---

[2] A "Form 3" is a "Response to Action Request." Country officials use the form to confirm or deny whether a vessel suspected of narcotics trafficking is registered to that country or is of that country's nationality. *See United States v. Aragon*, No. 15-Cr-292, 2017 WL 2889499, at *3 (S.D.N.Y. July 5, 2017).

About an hour after the United States made its request, the Ecuadorian Coast Guard sent Form 3, indicating that the *El Vacan*'s claim to Ecuadorian nationality could neither be confirmed nor denied and asking again for photographs.

Based on that response, the U.S. government concluded that the vessel was without nationality, subjecting it to the jurisdiction of the United States pursuant to the MDLEA. The U.S. boarding team arrested the four men who were on board and sank the *El Vacan* as a navigational hazard.

**II.  Procedural History**

On May 18, 2016, Alarcon Sanchez and Salinas Diaz were charged with violating and conspiring to violate the narcotics trafficking provisions of the MDLEA. Alarcon Sanchez and Salinas Diaz were subsequently extradited to the United States from Colombia on July 11, 2016, and September 1, 2016, respectively. Alarcon Sanchez, Salinas Diaz, and several other defendants moved to dismiss the superseding indictment, principally on the grounds that the MDLEA's jurisdiction over land-based conspirators violated the U.S. Constitution and the MDLEA's text and, in any event, the *El Vacan* was not a stateless vessel under the statute. The district court denied the motions. *United States v. Aragon*, No. 15-Cr-292, 2017 WL 2889499 (S.D.N.Y. July 5, 2017).

On November 17, 2017, Alarcon Sanchez pled guilty pursuant to a plea agreement, and on February 28, 2018, the district court sentenced him to five years' imprisonment, four years' supervised release, and a $100 special assessment.

On December 5, 2017, Salinas Diaz pled guilty pursuant to a plea agreement, and on April 10, 2018, the district court sentenced him to six years' imprisonment, four years' supervised release, and a $100 special assessment.

This appeal followed.

**DISCUSSION**

Alarcon Sanchez argues on appeal that the district court erred by denying his motion to dismiss the indictment because (1) the government presented insufficient evidence that the *El Vacan* was a stateless vessel subject to the jurisdiction of the United States under the MDLEA; (2) the text of the MDLEA does not reach foreign land-based conspirators; (3) construing the MDLEA to reach foreign land-based conspirators compels the conclusion that Congress exceeded its legislative authority under the Constitution's Define and Punish Clause, *see* U.S. Const., art. I, sec. 8, cl. 10; and (4) his conduct lacked the nexus to the United States that due process requires.

11

Salinas Diaz argues that the district court erred in failing to dismiss the superseding indictment because (1) Congress exceeded its legislative authority under the Define and Punish Clause in enacting the MDLEA and (2) the *El Vacan* was not on the high seas when the U.S. Navy interdicted it.

In reviewing the denial of a motion to dismiss an indictment, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013). Where, as here, defendants challenge convictions based on unconditional guilty pleas, we understand them to have "admit[ted] all of the elements" of their claims and to have "waive[d] all challenges to the prosecution except those going to the court's jurisdiction." *United States v. Yousef*, 750 F.3d 254, 258 (2d Cir. 2014) (internal quotation marks omitted).

**I.     Evidence of Statelessness**

Defendants attack the adequacy of their guilty pleas on the basis that the government failed to establish that the *El Vacan* was a stateless vessel subject to the jurisdiction of the United States.

12

## A. The MDLEA's Requirements

The MDLEA prohibits specified drug trafficking activity "[w]hile on board a covered vessel." 46 U.S.C. § 70503(a). A "covered vessel" means, as relevant here, "a vessel subject to the jurisdiction of the United States." *Id.* § 70503(e)(1). A vessel may be subject to the jurisdiction of the United States if it is "a vessel without nationality." *Id.* § 70502(c)(1)(A). A vessel is considered without nationality if "the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed," *id.* § 70502(d)(1)(A), or "the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality," *id.* § 70502(d)(1)(C). A claim of registry may be made in one of three ways: "(1) possession on board the vessel and production of documents evidencing the vessel's nationality . . . ; (2) flying its nation's ensign or flag; or (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel." *Id.* § 70502(e). "The response of a foreign nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State or the Secretary's designee." *Id.* § 70502(d)(2).

"Jurisdiction of the United States with respect to a vessel subject to [the MDLEA] is not an element of an offense." *Id.* § 70504(a). Rather, "[j]urisdictional

13

issues" that arise under the MDLEA "are preliminary questions of law to be determined solely by the trial judge." *Id.* We recently held that the MDLEA's jurisdictional language functions "not to confer subject matter jurisdiction on the federal courts, but rather to specify the reach of the statute beyond the customary borders of the United States." *Prado*, 933 F.3d at 132. In *United States v. Van Der End*, 943 F.3d 98 (2019), this Court observed that,

> where there is no factual basis to find that the vessel on which a defendant was apprehended was a vessel subject to the jurisdiction of the United States, the defendant may still be permitted to raise that issue on appeal even after pleading guilty. That is because "a defective guilty plea will not necessarily be deemed to waive all objections to a conviction."

*Id.* at 103 (quoting *Prado*, 933 F.3d at 151). This Court went on to explain, "when the government's proof that a vessel was subject to the jurisdiction of the United States is lacking," the defendant's guilty plea is invalid. *Id.* at 103 (internal quotation marks omitted).

Here, defendants did not challenge the validity of their guilty pleas in their initial appellate briefs, although they did so in supplemental briefing following our decision in *Van Der End*. The challenge fails because the government satisfactorily proved United States jurisdiction over the *El Vacan*.

14

**B.    Vessel without nationality**

The district court found that the government established that the *El Vacan* was a vessel without nationality because (1) there were insufficient markings and other identifying information on the vessel to put a reasonable official on notice that Ecuador's interests might be affected by the vessel's interdiction, and (2) Ecuadorian authorities responded that they could neither confirm nor deny the vessel's nationality.

The first ground, by itself, would not support a statelessness finding because, in *Prado*, this Court held that in "the absence of indicia of registration such as flying a nation's flag, presenting registration papers, or a volunteered assertion of national registration by the master," the burden is on the boarding party to inquire as to the vessel's nationality. *Prado*, 933 F.3d at 131. But here the boarding party made the required inquiry and, upon observing a small flag decal or painting near the engine and being told by the purported captain that the *El Vacan* was of Ecuadorian nationality with its home port in Puerto Manta, Ecuador, U.S. officials sought verification from authorities in Ecuador, the "claimed nation of registry." 46 U.S.C. § 70502(d)(1)(C). This comported with MDLEA statutory procedures. *Cf. Prado*, 933 F.3d at 132 (warning that boarding

15

party's inattention to MDLEA's statutory procedures can "virtually doom[] the prosecution to failure at the investigation stage"). Those procedures also state that the claimed nation of registry, in delivering its response, must communicate to U.S. officials "by radio, telephone, or similar oral or electronic means," *see id.* § 70502(d)(2), and its failure to "affirmatively and unequivocally assert" that the vessel is registered conclusively establishes statelessness under the statute, *see id.* § 70502(d)(1)(C).

Alarcon Sanchez argues, as did the defendant in *Prado*, that the government failed to adhere to the prescribed procedures. He argues that the government presented insufficient evidence to demonstrate statelessness because the United States cut off the process prematurely, depriving Ecuadorian officials the chance to affirmatively and unequivocally assert anything about the *El Vacan* without considering the additional information it requested—namely, photographs of the vessel taken by U.S. officials.

The government argues that defendants lack standing to challenge the adequacy of the interchange between the United States and Ecuador because the relevant procedures, though now codified in United States law, derive from an international treaty between sovereign nations.

16

We need not conclusively decide this question any more than we need decide the exact quantum of information that U.S. officials must provide to the claimed nation of registry, or whether they have an obligation to act in good faith in seeking verification. We are satisfied that the information the government provided Ecuadorian authorities about the *El Vacan* was sufficient to satisfy the MDLEA and, specifically, 46 U.S.C. § 70502(d)(1)(C). Indeed, the U.S. Coast Guard furnished all of the information that would have otherwise been captured in a photograph of the *El Vacan*, *see supra*, a point all but conceded by Alarcon Sanchez during oral argument.

The Ecuadorian Coast Guard responded to the verification request by indicating that it could neither confirm nor deny the *El Vacan*'s claim to Ecuadorian nationality. And, under the MDLEA, that response patently does not qualify as an affirmative and unequivocal assertion that the *El Vacan* was of Ecuadorian nationality. On this record, we conclude that the government satisfied its burden to prove that the *El Vacan* was a "vessel without nationality" as defined in 46 U.S.C. § 70502(d)(1)(C).

**II.    MDLEA and land-based conspirators**

Alarcon Sanchez argues that the application of the MDLEA to his foreign land-based conspiratorial conduct violates the Constitution's Define and Punish Clause and Due Process Clause. Before reaching these constitutional issues, we briefly explain why the MDLEA's text, structure, and purpose supports such extraterritorial application.

The MDLEA prohibits specified drug trafficking activity by individuals "[w]hile on board a covered vessel." 46 U.S.C. § 70503(a). The MDLEA explicitly provides that this substantive prohibition applies extraterritorially. *See id.* § 70503(b). The MDLEA also imposes criminal liability on those "attempting or conspiring to violate section 70503"—that is, attempting to engage in prohibited drug trafficking activity on board a covered vessel or conspiring with others to do so—and makes such persons "subject to the same penalties as provided for violating section 70503." *Id.* § 70506(b) (the "attempt-and-conspiracy provision").

Alarcon Sanchez argues that when read together, these provisions allow a person to be convicted of MDLEA conspiracy only when the person himself is found on board a covered vessel, and not when his conduct is entirely land-

18

based. In support, he cites both the presumption against extraterritoriality and the statutory text. Neither supports his argument.

The presumption against extraterritoriality is a canon of construction instructing that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Aust. Bank Ltd.*, 561 U.S. 247, 255 (2010). Even "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* at 265. But in the context of ancillary crimes such as aiding and abetting and conspiracy, it is "generally" recognized that "the extraterritorial reach of [the] ancillary offense . . . is coterminous with that of the underlying criminal statute." *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) (internal quotation marks omitted) (alterations in original); *cf. United States v. Hoskins*, 902 F.3d 69, 96–97 (2d Cir. 2018) (stating general rule but concluding it did not apply to certain conspiracies in violation of Foreign Corrupt Practices Act given specific statutory limitations).

Thus, Alarcon Sanchez concedes, as he must, that the extraterritorial application of the MDLEA's substantive provision extends to its conspiracy provision. Nevertheless, he argues that the extraterritorial reach of both

19

provisions is somehow restricted by the locational limitation of "on board a covered vessel" found in the substantive provision. Because the statement of extraterritorial application is limited to the substantive offense, he argues, "[t]he text and structure are most easily and naturally read as limiting the reach of the statute to crimes," whether substantive or conspiratorial, committed by individuals "while on board covered vessels." Appellant's Br. at 14. In his view, "Section 70506(b) merely fills a gap that would be left if someone on board a vessel conspired with others on board but committed no substantive narcotics crime," Appellant's Br. at 17, rather than sweep up "ordinary drug smugglers who never left home and never compassed any harm to Americans or American interests." Appellant's Br. at 8.

We do not read the MDLEA so narrowly. Most obviously, the attempt-and-conspiracy provision does not mention covered vessels at all. It requires only that the object of the conspiracy encapsulate conduct that violates one of the specified narcotics trafficking prohibitions on a covered vessel. Persons who knowingly and intentionally join in such a conspiracy need not themselves be on board the covered vessel to be guilty under Section 70506. This construction is supported by the D.C. Circuit's decision *United States v. Ballestas*, 795 F.3d 138, on

20

which the district court relied. In *Ballestas*, the court rejected the same

interpretation here urged by Alarcon Sanchez because it would make the

MDLEA's conspiracy-and-attempt provision merely redundant of its substantive

provision. *Id.* at 146. The court explained that if a person on a covered vessel

possessed the requisite intent to violate Section 70503, he would likely be guilty

of the underlying substantive offense—either through constructive possession,

*see United States v. Tinoco*, 304 F.3d 1088, 1123 (11th Cir. 2002), or aiding and

abetting, *see* 18 U.S.C. § 2(a). A court will not construe a statutory provision to

render it "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S.

167, 174 (2001); *see generally United States v. Epskamp*, 832 F.3d 154, 164 (2d Cir.

2016) (rejecting narrow construction of extraterritoriality provision in 21 U.S.C. §

959 because it would cause "redundancy within the federal statutory

framework").

And, as the government points out, construing the MDLEA's attempt-and-

conspiracy provision to reach conspirators who remain onshore is consistent

with traditional notions of conspirator liability. It is a well-settled rule "in the

law of conspiracy [that] the overt act of one partner in crime is attributable to

all." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). So, even if the MDLEA

does require an overt act of the conspiracy to take place on board a covered vessel, the acts of the on-board co-conspirator are nonetheless attributable to the land-based co-conspirator. It is not necessary that all conspirators be on board a covered vessel for each to be guilty of conspiring to violate Section 70503. *See Ballestas*, 795 F.3d at 146.

Our construction also comports with the MDLEA's underlying purpose. Congress specifically recognized that "trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. In 1980, Congress enacted the MDLEA's predecessor statute to close a loophole that had hampered the prosecution of drug smugglers apprehended on the high seas absent difficult-to-obtain evidence that the drugs were destined for the United States. S. Rep. No. 96-855, at 1–2 (1980). As the Senate Report explains:

> In most cases, evidence to prove importation or conspiracy beyond a reasonable doubt is impossible to obtain. Thus, in most cases the Coast Guard is able to seize and confiscate the ship and the illegal drugs, but the government is not able to prosecute the crew *or others involved in the smuggling operation*. Such actions have little deterrent effect on the crews or *the trafficking*

22

*organizations*. In the highly lucrative trade in illegal drugs, such occasional seizures are considered a part of the cost of doing business.

*Id.* (emphasis added).

Alarcon Sanchez's reading of the attempt-and-conspiracy provision would immunize many persons "involved" in MDLEA-precluded smuggling operations, among them, those decisionmakers who are central to the conspiracy but who never physically step foot on a vessel. He posits that Congress added the MDLEA's inchoate violations to reach the vessel "engineer that was responsible for maintaining the tanks containing cocaine," Appellant's Br. at 17, rather than the higher-ups that engineered the shipment in the first place. This undercuts Congress's findings on the scope and gravity of the threat posed by drug trafficking aboard vessels. *See e.g.*, *United States v. Ali*, 718 F.3d 929, 940 (D.C. Cir. 2013) ("[I]t is self-defeating to prosecute those [persons] desperate enough to do the dirty work but immunize the planners, organizers, and negotiators who remain ashore."). Like the D.C. Circuit, we decline to construe Section 70506 so narrowly as to allow "[d]rug kingpins and other conspirators who facilitate and assist in carrying out [MDLEA] trafficking schemes [to] fall

23

beyond the reach of the statute, compromising the overriding intent of Congress in enacting it." *Ballestas*, 795 F.3d at 145.

In sum, based on the MDLEA's purpose, Congress's decision to apply the MDLEA's substantive provisions "outside the territorial jurisdiction of the United States," and the nature of a MDLEA conspiracy offense relative to its substantive objective, we hold that Section 70506(b) encompasses conspiratorial conduct on shore in a foreign country.

**III.    Define and Punish Clause**

Alarcon Sanchez also argues that the MDLEA is unconstitutional as applied to his conduct because he never set foot on the *El Vacan* during the charged conspiracy.[3] Article I, section 8, clause 10 of the U.S. Constitution states: "The Congress shall have Power . . . To define and punish Piracies and *Felonies committed on the high Seas*, and Offences against the Law of Nations." U.S. Const. art I, § 8, cl. 10 (emphasis added). Alarcon Sanchez does not dispute that the

---

[3] In *Class v. United States*, 138 S. Ct. 798, 805 (2018), the Supreme Court held that a criminal defendant who enters an unconditional guilty plea may still appeal his conviction on the ground that the statute of conviction is unconstitutional. Pursuant to the holding in *Class*, defendants have a right to raise on appeal both as-applied and facial constitutional challenges to the MDLEA.

24

"Felonies" part of the Define and Punish Clause supports Congress's enactment of the MDLEA. *See United States v. Matos-Luchi*, 627 F.3d 1, 3 (1st Cir. 2010) (recognizing Congress to have invoked its constitutional power under Define and Punish Clause to enact MDLEA). Instead, he argues that, like the MDLEA, the Define and Punish Clause contains locational language: the high seas. Because Alarcon Sanchez was never on the high seas in connection with the charged conspiracy, he argues that the MDLEA cannot constitutionally be construed to reach his conduct.

The government offers two arguments in response. First, it contends that "settled principles of conspiracy law" impute the conduct of the four conspirators on the high seas to the other conspirators on land. Appellee's Br. at 29–30. Second, it argues that the Constitution's Necessary and Proper Clause supports the MDLEA's application to Alarcon Sanchez because Congress's regulation of drug trafficking on the high seas would be undermined if it could not reach conspiratorial conduct in a foreign territory that is integral to that trafficking. Because we agree with the government's second argument, we do not address its first.

25

The Necessary and Proper Clause provides that "Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. "[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are convenient, or useful or conducive to the authority's beneficial exercise." *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (internal quotation marks and citations omitted). "[T]he word necessary does not mean absolutely necessary." *Id.* at 134 (internal quotation marks and citation omitted). Rather, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* "The relevant question is simply whether the means chosen are reasonably adapted to the attainment of a legitimate end under the [relevant enumerated power]." *Gonzales v. Raich*, 545 U.S. 1, 37 (2005) (Scalia, *J.*, concurring in the judgment) (internal quotation marks omitted).

We agree with the government that prosecuting MDLEA conspirators who are not on the high seas is a means that is rationally related to the legitimate end of prosecuting MDLEA conspirators who are on the high seas. *See* 46 U.S.C. § 70501 (congressional findings that "trafficking in controlled substances aboard vessels is a serious international problem, [and] is universally condemned"). Our conclusion is reinforced by recognition that the conspirators most likely to control, direct, finance, and profit from such drug trafficking are more apt to remain on land than to venture on the seas. *See Ballestas*, 795 F.3d at 145; *cf. Ali*, 718 F.3d at 940. In order reasonably to address the serious problem of drug trafficking on the high seas, it is, therefore, necessary and proper for Congress to confer federal jurisdiction over all conspirators, both those who go on the seas and those who remain on land.

In any event, our task is not to decide whether punishing on-land conspirators actually advances Congress's legitimate objective of punishing drug traffickers on the high seas, because "the choice of means to that end presents a question primarily addressed to the judgment of Congress." *See Burroughs v. United States*, 290 U.S. 534, 547 (1934). "If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to

27

which they conduce to the end, the closeness of the relationship between the means adopted, and the end to be attained, are matters for congressional determination alone." *Id.*at 547–48. In light of this deference, we are satisfied that Congress has not exceeded its authority under the Necessary and Proper Clause in extending the MDLEA to cover the conduct of land-based conspirators.

## IV. Due Process

Alarcon Sanchez argues that the Due Process Clause requires some nexus or connection between the defendant and the United States in order for the MDLEA to cover land-based conspirators.[4] As a general rule the extraterritorial application of federal criminal law requires such a nexus so that a statute's application is not arbitrary or fundamentally unfair. *See Epskamp*, 832 F.3d at 168. However, we also held in *Van Der End* that no such nexus is required when MDLEA violations occur on stateless vessels because "MDLEA prosecutions involving stateless vessels do not present the same concerns that are present in

---

[4] We noted in *Van Der End* that this type of Due Process challenge to MDLEA prosecutions "is a purely legal question on which the government's constitutional power to prosecute [the defendant] turns," 943 F.3d at 105, and therefore, we may consider the argument in spite of a defendant's unconditional guilty plea.

28

the extraterritorial application of typical criminal statutes." 943 F.3d at 105. As we further explained:

> That is because stateless vessels are international pariahs that subject themselves to the jurisdiction of all nations *solely* as a consequence of the vessel's status as stateless. Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws. Thus, when a vessel is subject to the jurisdiction of another nation, a person trafficking drugs on board would have a legitimate expectation that because he has subjected himself to the laws of one nation, other nations will not be entitled to exercise jurisdiction without some nexus. The same is not true when a defendant attempts to avoid the law of *all* nations by travelling on a stateless vessel.

*Id.* at 105-06 (internal quotation marks and citations omitted).

In reaching this conclusion, we held that United States prosecution of persons on stateless vessels was neither arbitrary nor unfair. Not arbitrary, because any nation can exercise jurisdiction over such vessels. And not unfair, because persons who traffic drugs do so with the imputed knowledge that they are risking prosecution— "somewhere." *Id.* at 106.

The government maintains that *Van Der End* controls, and no nexus to the United States is required because the *El Vacan* was a stateless vessel. But this case is not on all fours with *Van Der End*. First, in *Van Der End* we specifically

29

declined to decide "what the Due Process Clause may require before persons *who are not on board a vessel without nationality*" can be prosecuted under the MDLEA. *Id.* at 105 n.4 (emphasis added). Second, in *Van Der End* we said that a nexus was not required for those on stateless vessels because the seafaring defendants had forfeited their protections under international law and were therefore fair game for any nation to "subject them to their laws." *Id.* at 105 (internal quotation marks and citation omitted). The same cannot be said about these defendants, who were obviously subject to Colombia's jurisdiction and laws—indeed, the United States relied on the Colombian government in their apprehension and extradition. But even if we assume that land-based conspirators who are not physically on board a stateless vessel can raise a nexus challenge to a MDLEA prosecution, that does not help defendants here.

Our precedent stresses that it is a heavy burden for defendants to demonstrate a due process violation in the application of a statute like the MDLEA, which indisputably applies extraterritorially. *Epskamp*, 832 F.3d at 168. Defendants cannot carry that heavy burden here. The due process requirement that there be a nexus between the defendant and the United States ensures that application of any such statute to that defendant "would not be arbitrary or

fundamentally unfair." *Id.*; *see United States v. Al Kassar*, 660 F.3d 108, 118–19 (2d Cir. 2011). "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Epskamp*, 832 F.3d at 168 (internal quotation marks omitted). And, as we noted in *Van Der End*, "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution i*n the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Van Der End,* 943 F.3d at 106 (internal quotation marks and citation omitted).

Applying these principles to the facts here, we conclude that Alarcon Sanchez's MDLEA prosecution was neither arbitrary nor fundamentally unfair. By conspiring with an international drug-trafficking organization to ship over 500 kilograms of cocaine on the high seas, using a U.S.-registered vessel and procuring false visas in the United States, Alarcon Sanchez "cause[d] harm" to the very U.S. interests animating the MDLEA: curtailing international drug trafficking on the high seas, which Congress found to be "a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501. There can be no doubt that Alarcon Sanchez and his co-conspirators were aware that

31

their scheme to transport cocaine on the high seas was illegal and could result in their criminal prosecution "somewhere." *Al Kassar*, 660 F.3d at 119 ("The defendants were not ensnared by a trap laid for the unwary."). Accordingly, in light of the conspiracy's nexus to United States interests in eliminating drug trafficking on the high seas, and the fair warning we ascribe to those that participate in such conspiracies, we conclude that due process was not offended by defendants' MDLEA prosecutions.

## V. Remaining arguments

Salinas Diaz argues that the MDLEA is facially unconstitutional because Congress exceeded its legislative authority in its enactment and that the statute is unconstitutional as applied to defendants because the *El Vacan* was not on the high seas when the U.S. Navy interdicted it.

### A. Congress's authority to enact the MDLEA

Congress has the authority "[t]o define and punish Piracies and Felonies committed on the high Seas." U.S. Const. art, I, § 8, cl. 10. "The clause encompasses three distinct powers: (i) to define and punish piracy; (ii) to define and punish felonies committed on the high seas; and (iii) to define and punish offenses against the Law of Nations." *Ballestas*, 795 F.3d at 146-47. Salinas Diaz

argues that the MDLEA is unconstitutional on its face because Congress lacked the constitutional power to enact it. But he has failed to specify any authority supporting his position. In the MDLEA, Congress punishes specified drug-trafficking activity on the high seas, which falls squarely within its constitutional power to punish felonies on the high seas. *See, e.g., United States v. Estupinan*, 453 F.3d 1336, 1338–39 (11th Cir. 2006); *United States v. Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003); *United States v. Ledesma-Cuesta*, 347 F.3d 527, 531-32 (3d Cir. 2003). Salinas Diaz's facial challenge is meritless.

**B. High Seas**

Finally, Salinas Diaz argues, in substance, that applying the MDLEA to a prosecution in connection with the *El Vacan* is unconstitutional because the vessel was not on the "high seas" when the U.S. Navy stopped it. We have previously considered that term as it appears in the Death on the High Seas Act, now codified at 46 U.S.C. § 30301 *et seq*. *See In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 209 F.3d 200, 205-15 (2d Cir. 2000). We concluded then that "high seas" means those beyond a nation's territorial waters. *Id.* at 205. Under current international law, a nation's territorial waters may extend "up to a limit not exceeding 12 nautical miles." U.N. Convention on the Law of the Sea art. 3,

33

*opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397. At the founding, the United States's territorial waters extended "roughly three miles." *In re Air Crash*, 209 F.3d at 205. Here, the *El Vacan* was 132 nautical miles off the coast of Costa Rica. That distance is comfortably beyond Costa Rica's territorial waters as the framers would have understood the term and under current international law. Accordingly, Salinas Diaz's argument fails.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.